NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-874

COMMONWEALTH

vs.

JEFFREY S. VIGIARD.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The defendant, Jeffery S. Vigiard, appeals from his convictions, after a jury trial in the Superior Court, of aggravated rape, G. L. c. 265, § 22 (a), witness intimidation, G. L. c. 268, § 13B, assaultive burglary, G. L. c. 266, § 14, and breaking and entering with the intent to commit a felony, G. L. c. 266, § 16. We conclude that an improperly worded statement in the Commonwealth's closing argument was not prejudicial and that there was no significant error in the prosecutor's recitation of the evidence. Further concluding that the trial judge acted within his discretion in excluding evidence (1) that the defendant asked for deoxyribonucleic acid (DNA) testing where the defendant failed to follow through in a timely manner with his request; and (2) that a man matching the victim's vague description of the perpetrator was found

intoxicated a few blocks from the location of and two months prior to the incident, we affirm.

1.  Background.  The victim was house sitting for her aunt and cousin when she woke up in the middle of the night to a man standing in the bedroom.  She started to scream, and the man "grabbed [her] by [her] mouth and covered [her] mouth with his [sock-covered] hand."  He told her to "be quiet" and to "do what he said or he was going to kill" her.  She "begged him not to hurt [her] or [her baby]," who was sleeping in the room.

The man told the victim to keep her eyes closed, so she put her arm over her eyes.  He proceeded to digitally rape her; touch, lick, and suck her breasts; lick around her vagina; and force her to perform fellatio on him.  While the victim was performing fellatio, she removed her arm from over her eyes and noticed the man's white skin, dirty white T-shirt, and white underwear.  She also smelled his odor of corn chips and old alcohol.

The man vaginally raped the victim then forced her to perform fellatio on him again.  He ejaculated in her mouth, on her "chest[,] and in [her] hair," and said something in what sounded to her like Spanish.

The man wiped off the victim's chest and private parts with a sock.  He told her that "if [she told] anybody about what happened he would find out because he knows people on the police

2

force and that he would come back and kill everybody in that house."  He also told her that she could not leave the house that night, and then he left.

The victim waited ten minutes, put on a sweatshirt and her cousin's sweatpants, left, and contacted the police from a nearby gas station.

Police took the victim to the emergency room, where a rape kit was collected.  The victim provided statements to the police at both the hospital and later at the police station.

The rape kit swab of the victim's hair had the largest sample of sperm cells, and those cells matched the defendant's DNA profile with a microscopic probability of matching another random individual's profile.  The swabs of the victim's breasts and abdomen each had a single sperm cell that was not tested for a DNA profile.  There was also a single sperm cell in the crotch area of the sweatpants worn by the victim, which was not tested for a DNA profile, but the victim's vaginal swab was negative for sperm cells and seminal fluid.  The victim's oral swab was negative for sperm cells and seminal fluid, and the victim's retainer was never tested.

The defendant's theory was that his semen got on a sock that the rapist used during the assault.  The method by which the defendant theorized that his semen got on the sock need not

3

be recounted here, except to say that it was inherently implausible and the jury would likely have been skeptical of it.

2. _Closing argument_. "A prosecutor must limit comment in closing statement to the evidence and fair inferences that can be drawn from the evidence." Commonwealth v. Lugo, 89 Mass. App. Ct. 229, 234 (2016), quoting Commonwealth v. Cole, 473 Mass. 317, 333 (2015). "Because the line separating . . . inference [and speculation] is often a fine one, 'we must and do recognize that closing argument is identified as argument.'" Commonwealth v. Mattei, 90 Mass. App. Ct. 577, 582 (2016), quoting Commonwealth v. Bresilla, 470 Mass. 422, 437-438 (2015). We review the prosecutor's remarks "in the context of the entire argument, and in light of the judge's instruction to the jury, and the evidence at trial." Commonwealth v. Sanders, 101 Mass. App. Ct. 503, 511 (2022), quoting Commonwealth v. Braley, 449 Mass. 316, 328-329 (2007).

a. _DNA testing_. In response to the defendant's argument that the Commonwealth should have tested additional DNA samples, the prosecutor explained in detail why the DNA on the sweatpants could not have been left by the rapist. He then argued,

> "[The defense attorney] can talk all he wants about the single sperm cells and shouldn't we have tested them but the reality is, they hold no evidentiary value. We're going to test the things that are related to what occurred, aren't we? They're not going to tell us anything, at least something that we don't already know. It's not just what

4

this biological material is, it's where it's found that's relevant, isn't it?"

Although "[t]he prosecutor was entitled to offer a response to defense counsel's closing argument," Mattei, 90 Mass. App. Ct. at 583, quoting Bresilla, 470 Mass. at 438, here, as the Commonwealth acknowledged at oral argument, the prosecutor's argument was poorly worded. "Because the defendant objected to the argument at trial, we review for prejudicial error." Commonwealth v. Andrade, 468 Mass. 543, 551 (2014). There was none.

Although the prosecutor's assertion that the single sperm cells "hold no evidentiary value" was significantly overstated, and his use of the first person plural pronoun was ill-advised in this context, the core of the prosecutor's argument was proper and based in the evidence. The prosecutor was entitled to remind the jury that a forensic scientist testified that the best sample to test was the sperm on the victim's hair because the single sperm cell samples found elsewhere would be "a limited amount to work with." Furthermore, the prosecutor was entitled to argue that the single sperm cell found in the crotch area of the sweatpants worn by the victim was probably not from the rape because the defendant did not ejaculate into the victim's vagina and the victim's vaginal and external genital swabs were negative for sperm cells. The jury would have

5

understood the prosecutor's argument in the context it was offered as an argument that the best evidence had been tested.

b. Evidence recitation. The defendant challenges three portions of the prosecutor's closing argument as asserting facts not in evidence. See Commonwealth v. Goddard, 476 Mass. 443, 449 (2017) (prosecutor may not "refer to facts not in evidence in a closing argument"). "Because the defendant did not object to [these portions of] the prosecutor's closing statement at trial, we review [any error] for a substantial risk of a miscarriage of justice." Commonwealth v. Holguin, 101 Mass. App. Ct. 337, 341 (2022), quoting Commonwealth v. Proia, 92 Mass. App. Ct. 824, 835 (2018). There was no substantial risk of a miscarriage of justice.

First, the prosecutor stated that "[the victim] told you [that the perpetrator] was sp[ea]king with what sounded like a fake Spanish accent, a claim that she repeated to the detectives at the hospital, a claim she repeated in her statement and on the stand, speaking with what sounded like a fake, Spanish accent." This assertion was supported by the trial testimony. At trial, the two detectives who spoke with the victim at the hospital testified that the victim said that the perpetrator "talked in an accent but [she] felt that he was faking the accent," and "spoke broken English with a Spanish accent although she thought the accent was fake." Additionally, the

6

victim testified that "[a]t some point [she] talked to an officer or a detective somewhere along those lines and [she] told them it sounded like it was someone using a fake accent to cover -- like to change their voice at some point."  The prosecutor could permissibly infer and argue that the victim told the detectives about the fake accent at the hospital and in her subsequent statement to the police.  See Commonwealth v. Rakes, 478 Mass. 22, 45 (2017) (prosecutor may "zealously argue in favor of those inferences favorable to his or her case").

Second, the prosecutor said, "[the defense attorney] wants you [to] believe that nobody noticed in [sic] matted hair.  [The victim] didn't say anything about this matted hair.  Well, you heard her testify.  You heard her testify about where the person ejaculated, where that semen went."  This statement was supported by the victim's testimony that the perpetrator "ejaculated in [her] mouth . . . [o]n [her] chest and in [her] hair," and that she "assum[ed] [that she] said that to [the nurse]."

Third, the prosecutor incorrectly referred to "retesting" the victim's retainer instead of "testing" it.  The prosecutor said,

> "What did the criminalist tell us about the oral swabs of [the victim]'s mouth?  Negative for semen, negative for sperm cells.  Did you hear testimony that she consumed a drink prior to having this examination starting?  What are

7

we going to gain from retesting the retainer if her mouth
is negative?"

Here, "retesting" was an inconsequential slip of the tongue, and the jury would have understood it as such. Multiple witnesses testified at trial to the undisputed fact that the retainer was never tested. This slip of the tongue created no substantial risk of a miscarriage of justice. See Commonwealth v. Sleeper, 435 Mass. 581, 596 (2002) ("lapses [in prosecutor's closing argument] were inconsequential").

3. Excluded Bowden evidence. "Defendants have the right to base their defense[s] on the failure of police adequately to investigate a [crime]." Commonwealth v. Martinez, 487 Mass. 265, 270 (2021), quoting Commonwealth v. Phinney, 446 Mass. 155, 165-166 (2006). "From this evidence, the defendant may pursue a so-called Bowden defense, arguing that the jury should 'find a reasonable doubt' because 'the investigation was careless, incomplete, or so focused on the defendant that it ignored leads that may have suggested other culprits.'" Commonwealth v. Grier, 490 Mass. 455, 474 (2022), quoting Commonwealth v. Alvarez, 480 Mass. 299, 316 (2018). See Commonwealth v. Bowden, 379 Mass. 472, 485-486 (1980). "A defendant does not, however, have an unfettered right to elicit evidence regarding the adequacy of the police investigation. The admissibility of such evidence hinges first, and foremost, on its relevance."

8

<u>Commonwealth</u> v. <u>Moore</u>, 480 Mass. 799, 808 (2018).  "<u>Bowden</u> evidence is admissible so long as its probative value is not substantially outweighed by its prejudicial effect."  <u>Id</u>. at 809 n.9.

On appeal, "[w]e review a judge's evidentiary rulings for an abuse of discretion."  <u>Commonwealth</u> v. <u>Andre</u>, 484 Mass. 403, 414 (2020).  "We will conclude that there has been an abuse of discretion only if the judge has 'made "a clear error of judgment in weighing" the factors relevant to the decision, . . . such that the decision falls outside the range of reasonable alternatives.'"  <u>Commonwealth</u> v. <u>Hammond</u>, 477 Mass. 499, 505 (2017), quoting <u>L.L.</u> v. <u>Commonwealth</u>, 470 Mass. 169, 185 n.27 (2014).  There was no error here.

a.  <u>Request for additional DNA testing</u>.  The trial judge excluded evidence that the defendant requested additional DNA testing because a motion judge had allowed the defendant's motion for funds, the defendant did nothing to pursue additional DNA testing for three months, then another motion judge withdrew the funds from the defendant because of the unreasonable passage of time.  Far from supporting the defendant's <u>Bowden</u> defense, admitting evidence that the defendant had requested additional DNA testing would have opened the door to the Commonwealth's presenting evidence about why the defendant did not get the additional DNA testing, creating a risk that the jury would hold

9

that lack of additional DNA testing against the defendant and in any event opening up a sideshow.  See Commonwealth v. Colon, 482 Mass. 162, 187 (2019), quoting Commonwealth v. Silva-Santiago, 453 Mass. 782, 803 n.25 (2009) ("A Bowden defense . . . is 'a two-edged sword for the defendant, because it opens the door for the Commonwealth to offer evidence explaining why the police did not follow the line of investigation suggested by the defense'").  Instead, the trial judge properly allowed the defendant to repeatedly elicit the uncontested fact that some of the samples were untested, thereby allowing the defendant to present his Bowden defense.

b.  Third-party culprit.  "[T]hird-party culprit information is admissible under a Bowden defense only if the police had learned of it during the investigation and failed reasonably to act on the information."  Commonwealth v. Steadman, 489 Mass. 372, 385 (2022), quoting Silva-Santiago, 453 Mass. at 803.  "In order for Bowden evidence to be admitted . . . 'the probative weight of the Bowden evidence [may not] exceed[] the risk of unfair prejudice to the Commonwealth from diverting the jury's attention to collateral matters.'"  Commonwealth v. Scott, 470 Mass. 320, 330 (2014), quoting Silva-Santiago, supra.

Here, the trial judge properly excluded evidence that, two months prior to the rape, an officer found an intoxicated

10

Hispanic man wearing dirty clothes on the street in front of a nearby pub.[1]  Because the only information that the police had connecting that man to the incident was that he matched a vague description provided by the victim,[2] the decision not to further investigate this man had minimal relevance to the adequacy of the police investigation but would have unfairly prejudiced the Commonwealth's case by diverting the jurors' attention.  The judge acted within his discretion in excluding the evidence. See Commonwealth v. Acevedo, 492 Mass. 381, 392 (2023), quoting Martinez, 487 Mass. at 271 (victim's drug involvement properly excluded where defendant sought to argue that police investigation was inadequate for failure to investigate whether

---

[1] The man was also seen walking on streets near the rape "several" times in the two months preceding the rape.
[2] The man was shorter than five feet, ten inches, spoke Spanish and broken English, and had been "placed in protective custody three or four times" for "[a]lcohol related" offenses.

11

victim was killed by rival drug dealer because that theory "was 'no more than speculation and conjecture'").[3]

<u>Judgments affirmed</u>.

By the Court (Wolohojian, Shin & Ditkoff, JJ.[4]),

*Joseph F. Stanton*

Clerk

Entered:  December 6, 2023.

---

[3] Because we discern only a single error from the issues raised by the defendant, we need not address the defendant's cumulative error argument.

[4] The panelists are listed in order of seniority.

12