NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11535


COMMONWEALTH  vs.  JONATHAN NIEMIC.



Bristol.    April 9, 2015. - September 17, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.



Homicide.  Practice, Criminal, Capital case, Assistance of
counsel, Argument by prosecutor, Cross-examination by
prosecutor, Instructions to jury.  Evidence, Argument by
prosecutor, Self-defense, Cross-examination, Impeachment of
credibility, Prior inconsistent statement.  Self-Defense.
Constitutional Law, Assistance of counsel.




Indictment found and returned in the Superior Court
Department on December 9, 2010.

The case was tried before Thomas F. McGuire, Jr., J.


Theodore F. Riordan (Deborah Bates Riordan with him) for
the defendant.
Tara L. Blackman, Assistant District Attorney, for the
Commonwealth.


SPINA, J.  On October 20, 2010, the defendant stabbed the

victim six times with a small folding pocket knife, killing him.

The Commonwealth's theory of motive was that both men had been

vying for the affection of the same woman. The primary dispute at trial was whether the victim was the first aggressor, whether the defendant acted in self-defense, and who first had possession of the knife. The jury convicted the defendant of murder in the first degree on a theory of extreme atrocity or cruelty. On appeal the defendant asserts error by trial counsel, by the prosecutor, and by the judge. He claims that trial counsel was ineffective (1) for making an incorrect argument about voluntary manslaughter (which he asked the jury to find), and (2) for failing to request an instruction on involuntary manslaughter. The defendant argues that the prosecutor improperly cross-examined him on his right to remain silent, including (1) questions about why he had not gone to police with his version of events, (2) questions about his failure to tell his grandmother and friends that he was defending himself, and (3) questions that emphasized his failure to tell anyone his version of events until trial. The defendant also contends that the prosecutor (4) improperly appealed to the sympathy of the jury in his closing argument, and (5) made improper argument about the defendant's failure to call witnesses to corroborate his testimony. The defendant asserts that the judge erred (1) by failing to instruct the jury that the Commonwealth must disprove the absence of excessive force in self-defense, and (2) by giving an incorrect instruction on

self-defense.  We conclude that the combined effect of the prosecutor's closing argument and trial counsel's failure to request a voluntary manslaughter instruction based on reasonable provocation requires that the defendant be given a new trial. However, we give the Commonwealth the option of either accepting a reduction of the verdict to manslaughter, or having the conviction vacated and proceeding with a new trial.

1.  Background.  The jury could have found the following facts.  We reserve other details for discussion of specific issues.  The defendant was incarcerated on an unrelated matter from about the middle of August, 2010, until October 15, 2010. While he was incarcerated, the defendant wrote a letter to a woman named Lisa whom he had started dating in June.  In the letter he confessed that he thought she was "perfect."  During the defendant's incarceration the victim took notice of Lisa and began flirting with her.  After the defendant was released from his incarceration he learned of the developing relationship between the victim and Lisa.  This angered the defendant, who told a friend that the next time he saw the victim he was going to punch him in the head.  On October 19, 2010, the defendant and Lisa socialized with another couple until about 11 P.M.  At one point the defendant and Lisa became involved in a mild argument over the victim.  The two couples agreed to get together the next day.

The two couples met at about 2 P.M. on October 20, as planned.  At about 7:30 P.M. they went to a soup kitchen in New Bedford because Lisa had forgotten her key to the addiction recovery house for women where she was staying, and other residents of the recovery house were at the soup kitchen attending an Alcoholics Anonymous meeting.  She planned to borrow a key from one of the residents who was at the meeting.  The victim was at the meeting.  The defendant and Lisa appeared to be having a serious conversation.

During a break in the meeting the defendant walked over to the victim and said he had been hearing things that the victim was saying about him, and he felt "disrespected."  The defendant then started punching the victim in the head.  The victim tried to deflect the blows and backed away.  The defendant started chasing and lunging at the victim.  He stabbed the victim six times with a small folding pocket knife, a type of knife the defendant owned.  The incident lasted no more than thirty seconds.  The defendant left the scene with the people who had arrived with him.  As they were driving, the defendant said that he had stabbed the victim, adding, "I hope I didn't kill him."  The victim died later that night from his wounds, which included two puncture wounds to the heart and one that completely passed through the liver.

The defendant threw the knife into a wooded area. It was later recovered by police. The defendant's friends left him at a supermarket where he telephoned his grandmother. He asked her to give him a ride. The defendant's grandmother drove him to the home of one of his close friends. He told one of the people living there that he had gotten into a fight over a girl with someone at the soup kitchen. He said that he and the other man got into a fist fight, and that the other man got the better of him. The defendant said that he went to the vehicle in which he had arrived, retrieved a knife, and then "slashed" the other man in the chest two or three times. He said that he did not know if the other man was still alive. This person heard him make several telephone calls trying to find out if the other man was alive. The defendant seemed very worried.

Police went to the friend's house looking for the defendant at approximately 2 A.M. on October 21, 2010. They found him hiding in a cubby hole in a rear hallway. He was placed under arrest. Police observed a fresh cut on the defendant's right hand between the webbing of his right index finger and his thumb. They also observed three fresh cuts on his left hand, two of which were between the webbing of his index finger and his thumb, and the third was on the pad of this thumb.

A friend with whom the defendant had socialized on October 19 and 20, 2010, testified for the defense. He said that the

victim threw the first punch.  He also testified that about two months before the killing, the victim had threatened to stab the defendant.  The defendant testified in his defense.  He said that he was fearful of the victim, who was known as a "tough guy," and referred to as "Big Mike."  The victim was "a lot bigger" and ten years older than the defendant.  He said that he wanted to resolve their issues by talking when other people were nearby.  He testified that the victim started punching him and then pulled out a knife.  The defendant grabbed the blade of the knife and pulled it out of the victim's hand.[1]  The victim came after him and tried to grab him.  The defendant swung the knife "wildly" in order to defend himself.  He said that he did not realize that he was stabbing the victim, or that the victim might be seriously hurt, and that he broke down in tears over the incident.  He said that he never intended to kill the victim.

The defendant testified that he once owned a similar knife, but not at that time.  He said that the knife that was involved in the stabbing was not his, and that he did not recall telling anyone that the fight was over a girl.  He denied going back to the car in which he arrived at the soup kitchen to get the

---

[1] There is no dispute that deoxyribonucleic acid (DNA) testing on the knife handle and blade revealed blood from at least two individuals, that the defendant's DNA matched the major profile, and that the victim was a potential contributor of the minor profile.

knife, and he said that he had no recollection of telling anyone that he did so. He testified that the victim had threatened to stab him about two months before the stabbing.

2. <u>Ineffective assistance of counsel</u>. The defendant first contends that trial counsel was ineffective for failing to request a jury instruction on involuntary manslaughter, based on his testimony that he did not intend to kill the victim. See <u>Commonwealth</u> v. <u>Whitman</u>, 430 Mass. 746, 753 n.13 (2000) (involuntary manslaughter involves unintentional unlawful killing). We need not dwell on this issue. The defendant cites no authority in support of this argument. The blade of the knife used to kill the victim penetrated the victim's body to a depth greater than the length of the blade. The Commonwealth's pathologist testified that this can occur when the force with which the knife is thrust into the body compresses the rib cage. The force was so great that the knife blade went completely through the victim's liver. The victim had been stabbed six times, including in the chest, back, and side. In comparable circumstances, this court has said that an onslaught of this degree does not support a finding that the killing was unintentional, notwithstanding a defendant's statement that he did not intend to kill the victim. A request for an involuntary manslaughter instruction properly would have been denied. See <u>Commonwealth</u> v. <u>Tague</u>, 434 Mass. 510, 518-519 (2001), cert.

denied, 534 U.S. 1146 (2002); Commonwealth v. Dunton, 397 Mass. 101, 103 (1986); Commonwealth v. Golston, 373 Mass. 249, 260 (1977), cert. denied, 434 U.S. 1039 (1978). Counsel was not ineffective for failing to request an instruction that was not warranted by the evidence. See Commonwealth v. Leng, 463 Mass. 779, 788 (2012).

The defendant next argues that counsel was ineffective for making a legally incorrect and confusing argument on self-defense and voluntary manslaughter.[2] He contends that trial counsel urged the jury to find the defendant guilty of manslaughter because he had acted in self-defense. The correct statement of law, he maintains, would have been that the defendant should be convicted of manslaughter because he had used excessive force in self-defense. However, he continues, trial counsel argued self-defense, which should have culminated in a request for a verdict of not guilty. Counsel was ineffective, the defendant concludes, because he failed to explain why the verdict should be manslaughter.

The defendant misstates trial counsel's argument. Trial counsel never used the term "self-defense" in his argument, and

---

[2] A claim of ineffective assistance of counsel made on the trial record alone, as here, "is the weakest form of such a challenge because it is bereft of any explanation by trial counsel for his actions and suggestive of strategy contrived by a defendant viewing the case with hindsight." Commonwealth v. Peloquin, 437 Mass. 204, 210 n.5 (2002).

he expressly said that he was not asking the jury to find the defendant not guilty. The argument was purely factual. Counsel argued that the significant variations in the eyewitness testimony were understandable because there were many people milling about and conversing in small groups during a break in the Alcoholics Anonymous meeting. The various witnesses caught different and only partial glimpses of this very brief incident. In most instances, the glimpse that a witness caught was in his or her peripheral vision. As a result, no one witness saw the entire incident, and there were obvious flaws in some perceptions of what occurred. The culmination and thrust of the argument was that there was one fact that was not in dispute, and that was that the defendant sustained cuts on his hands, and his blood was found on the knife. This could only be explained, he reasoned, by the defendant's testimony that the victim was the one who introduced the knife to the fray, and the defendant's hands were cut as he wrested it away from him. Counsel also argued, based on the testimony of the defendant's friend, that the victim had been the first aggressor. Although counsel never used the words "self-defense" or "excessive use of force in self-defense," it is readily apparent that counsel was urging the jury to find that the defendant, armed with the knife he had taken from the victim, used excessive force in self-defense while the victim continued to pursue him.

This was not a model closing argument, but it was adequate. Counsel's decision to focus on the single fact that was essential to the jury's acceptance of his manslaughter theory, namely, the victim's introduction of lethal force, without discussing the applicable law, was not a manifestly unreasonable strategy.  See Commonwealth v. Adams, 374 Mass. 722, 728 (1978) (tactical decision of counsel will not constitute ineffective assistance unless it was manifestly unreasonable when made). Counsel reasonably could have thought that a brief closing that concentrated on the most critical fact for the defense would emblazon the importance of that fact on the minds of the jurors and become the centerpiece of their deliberations.  He reasonably could have anticipated that in short order his closing would play directly into what the judge would instruct the jury on self-defense and use of excessive force in self-defense, and that it would be more beneficial to concentrate on the facts without a discussion of the law.

Typically (and properly), lawyers are permitted some leeway during closing argument to discuss the law as it pertains to their case, to give context to the facts they argue, but they are not required to do so.  Cf. Commonwealth v. Jones, 432 Mass. 623, 628 (2000) ("Prosecutors and defense counsel must restrict their closing arguments to the evidence and [permissible] inferences that can be drawn from the evidence").  However,

lawyers may not misstate principles of law in closing argument. See Commonwealth v. Thomas, 401 Mass. 109, 113 (1987). The prosecutor barely discussed the law in his closing argument. Counsel's decision to leave the jury with the factual crux of the defense, without comment on the law, did not amount to ineffective assistance.

3. Cross-examination of the defendant. The prosecutor cross-examined the defendant about his failure to tell civilian witnesses that he was defending himself, his failure to contact police prior to his arrest and tell them that he was acting in self-defense, and whether the first time that he told anyone that he was defending himself was at trial. The defendant argues that these questions constituted improper comment on his right to remain silent, and that a new trial is required. See Doyle v. Ohio, 426 U.S. 610, 619 (1976); Commonwealth v. Person, 400 Mass. 136, 140 (1987). There was no objection, so we review under the standard of a substantial likelihood of a miscarriage of justice. See Commonwealth v. Wright, 411 Mass. 678, 681 (1992), S.C., 469 Mass. 447 (2014).

During his direct examination the defendant testified that he had approached the victim. The victim "snapped" at him, and then threw a punch at him. The victim then produced the knife, but the defendant grabbed it from him. The victim came at the defendant, who swung "wildly" at the victim to try to keep him

at bay. The defendant testified that he did not realize that he was stabbing the victim, and that he did not intend to kill him. Later, he called for his grandmother to pick him up. He was in shock and was crying over what had happened. On cross-examination the defendant said that he learned that the victim had been hurt badly and that he was concerned for the victim, as well as for himself. He telephoned a number of people trying to find out how the victim was doing, and what kind of trouble he might be facing.

Earlier in the trial a Commonwealth witness had testified that the defendant came to the house of a friend, where the witness had been staying. The defendant appeared worried, and the witness asked him what had happened. The defendant described the encounter with the victim, as previously discussed, including an admission that he, the defendant, went to the vehicle in which he arrived and obtained a knife. The defendant also made statements about the stabbing as he and others drove from the scene.

This was not a case in which the defendant was confronted with his prearrest silence. See, e.g., Commonwealth v. Nickerson, 386 Mass. 54 (1982). This was a case where the prosecutor was confronting the defendant with his prearrest statements, and impeaching him with inconsistencies between those statements and his trial testimony. The defendant never

mentioned in his prearrest statements that he had acted in self-defense or that the victim was the first aggressor.  The prosecutor was entitled to cross-examine the defendant about those inconsistencies, including any omissions in those statements that were different from his trial testimony.  See Commonwealth v. Hesketh, 386 Mass. 153, 161 (1982).  An omission in a prior statement may render that statement inconsistent "when it would have been natural to include the fact in the initial statement."  Commonwealth v. Ortiz, 39 Mass. App. Ct. 70, 72 (1995).  See Commonwealth v. Perez, 460 Mass. 683, 699 (2011); Mass. G. Evid. § 613(a)(2) & notes (2015).  Where the defendant had been worried about the fate of the victim, as well as his own legal fate, it would have been natural to explain that he was acting in self-defense when describing the incident in his prearrest statement to civilian witnesses.  The prosecutor acted appropriately when cross-examining the defendant about what he told and what he did not tell civilian witnesses.

The prosecutor's cross-examination of the defendant about his failure to seek out police to report that the victim might be in need of medical attention, and to tell them he acted in self-defense, was not proper.  Although the prosecutor might properly have cross-examined the defendant about his "concern" for the victim by asking if he called for an ambulance, it would

not have been natural for him to seek out police to tell his exculpatory story. Compare Commonwealth v. Barnoski, 418 Mass. 523, 536 (1994). This was error, but we conclude that it did not create a substantial likelihood of a miscarriage of justice. The defendant had made several prearrest statements to friends in which he made no reference to self-defense. We are satisfied that questions about his failure to seek out police to say he acted in self-defense added little, if anything, to the impact on the jury of the several statements he made to his friends in which he made no mention of self-defense. Moreover, the prosecutor did not mention the matter in his closing argument, thus keeping any prejudice at a minimum. See id. at 537 n.7.

4. Prosecutor's closing argument. The defendant contends that the prosecutor made improper closing argument by appealing to the sympathy of jurors, and by arguing that the defendant failed to call witnesses to testify about the victim's reputation for violence. Because the defendant did not object to the prosecutor's argument, our review is under the standard of a substantial likelihood of a miscarriage of justice. See Wright, 411 Mass. at 681. In making that determination, the cumulative effect of all the errors must be "considered in the context of the arguments and the case as a whole." Commonwealth v. Maynard, 436 Mass. 558, 570 (2002). If a defendant establishes that the prosecutor's closing argument was improper,

we are guided by the following factors when deciding whether a new trial is required:  "whether 'defense counsel seasonably objected to the arguments at trial . . . whether the judge's instructions mitigated the error . . . whether the errors in the arguments went to the heart of the issues at trial or concerned collateral matters . . . whether the jury would be able to sort out the excessive claims made by the prosecutor . . . and whether the Commonwealth's case was so overwhelming that the errors did not prejudice the defendant.'"  Id., quoting Commonwealth v. Santiago, 425 Mass. 491, 500 (1997), S.C., 427 Mass. 298, and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998). See Commonwealth v. Kozec, 399 Mass. 514, 516-518 (1987).

The prosecutor's argument covered thirty pages of the trial transcript.  For the most part, it was highly structured and grounded in the trial record.  About one-third of the way through his closing, when discussing the defendant's testimony that he was "scared" of the victim, that the victim was bigger and ten years older, and that the victim had a reputation as a "tough guy," the prosecutor argued as follows:

> "Bad guy, tough guy, bad reputation.  Where's the evidence of that?  Only out of his mouth.  And when you consider the credibility of witnesses in this case, you have to consider bias, motive to lie.  Who has the biggest interest in the outcome of this case?  This guy.  He's the one on trial. He's the one who wants to make you think poorly of [the victim].  Because that helps him.  Because then that starts to make you think maybe the guy wasn't such a good guy.

     Maybe this isn't such a big deal.  <u>There's no evidence of
     that</u>."  (Emphases added.)

The defendant contends that the argument constituted an improper
missing witness argument.  There is some force to the claim.
The argument implies, among other things we will discuss
shortly, a failure to call witnesses on the question of the
identity of the first aggressor.  As such, it was improper
because the prosecutor did not first obtain judicial approval to
make a missing witness argument, see <u>Commonwealth</u> v. <u>Pena</u>, 455
Mass. 1, 16-17 (2009), and Mass. G. Evid. § 1111(a) (2015), and
because testimony from third-party witnesses regarding the
victim's reputation would not be admissible.  See <u>Commonwealth</u>
v. <u>Adjutant</u>, 443 Mass. 649, 664-665 (2005) (testimony by third-
party witnesses as to victim's reputation for violent behavior
to establish that victim was first aggressor is inadmissible).

     We discern another flaw in this argument.  A prosecutor may
argue that a testifying defendant has an interest in the outcome
of a case and his credibility may be scrutinized on that basis,
see <u>Commonwealth</u> v. <u>Ortega</u>, 441 Mass. 170, 181-182 & n.19
(2004), but the argument must be understated and approached
cautiously.  Here, it was not.  The clear premise of the
prosecutor's argument is that the defendant's testimony, because
he was the defendant and on trial, did not even qualify as
evidence because it was inherently incredible.  The argument was

patently improper.  Cf. Commonwealth v. Scesny, 472 Mass. 185,
201-202 (2015) (prosecutor improperly described evidence
introduced by defendant as not material or relevant and
therefore not to be considered as evidence).

Toward the end of his argument the prosecutor focused on
the Cunneen factors that must be considered on the question of
extreme atrocity or cruelty.  They are: indifference to the
victim's suffering, the consciousness and degree of suffering of
the victim, the number of stab wounds and physical punches
thrown, the manner and force with which the stab wounds were
inflicted, and the disproportion between the means needed to
cause death and those employed.  See Commonwealth v. Cunneen,
389 Mass. 216, 227 (1983).  This part of the prosecutor's
closing was very powerful, and proper.  The prosecutor should
have stopped there.  He ended his closing argument with a highly
improper, emotionally charged discussion covering three pages of
transcript.

The prosecutor built upon the Cunneen factors.  He
commented that the civilian witnesses, who were "at the wrong
time at the wrong place," tried to save the victim, only to
"[see] the color run right out of him, right down to gray.  And
they saw him struggling and bleeding in front of his own
father."  The emotional impact on witnesses of the victim's
death was not a proper matter for consideration by the jury.  In

contrast to the defendant's indifference, the prosecutor developed a mantra of how "[the victim's] life mattered" to his family, to the civilians who tried to save him, to the paramedics who summoned heroic effort to try to save this "total stranger," to the police who investigated the case, and "to all of us."  He ended with a statement that the victim "has as much right . . . [to live as] this defendant . . . has an absolute right to a fair trial. . . .  [The victim] had a [c]onstitutional right to live, to pursue whatever means of happiness he chose to pursue.[3] . . .  [H]e was a human being just like any of us, and . . . there was an inherent value to his life just like any of our lives."  He asked the jury, on behalf of the Commonwealth, to return "a fair and just verdict," adding that the victim "asks for no more, but he deserves nothing less," because the defendant "chose . . . to end the life of [the victim]" out of "anger."

It is improper for a prosecutor to characterize a criminal trial as a dispute between a deceased victim on the one hand, and the defendant on the other, and to exhort the jury to dispense justice _evenly_ between them.  The deceased is not a party to the case.  A criminal trial places the interests of the Commonwealth and the defendant against one another.  An argument

---

[3] The prosecutor had argued earlier that the victim "had every right to have an acquaintance with Lisa Weaver, as well as she did" with the victim.

that asks the jury to give justice to the victim is an improper appeal to sympathy for the victim.  See Commonwealth v. Drumgold, 423 Mass. 230, 253 (1996).  The prosecutor's improper call to justice for the victim was aggravated by his inclusion of the paramedics and the civilian witnesses to the victim's last moments in his appeal to sympathy.  Similarly, the prosecutor's argument that the victim's life mattered, and that the victim had a constitutional right to live, were improper appeals to sympathy.  See Commonwealth v. Torres, 437 Mass. 460, 464-465 (2002).

These improprieties were not just fleeting comments or minor aspects of his closing argument, nor were they the type of afterthought that we have said does not require reversal.  See, e.g., Commonwealth v. Judge, 420 Mass. 433, 451-452 (1995) (single improper sentence appealing to sympathy does not require new trial).  The improper comments at the end of the closing comprised a structural segment, indeed, the denouement of the prosecutor's closing.  This section of his argument was integrated into his argument of the Cunneen factors, particularly the defendant's indifference to the victim's suffering.  The juxtaposition of the defendant's indifference with the effect of the killing on the paramedics, the civilian witnesses, the police, and "all of us," for whom the victim's life "mattered," was demonstrably improper.  It suggested that

everyone's collective concern for the victim's life was a legally relevant consideration of and, by way of contrast, an illumination of the defendant's indifference to the victim's suffering. Although jurors may be credited as having a "certain measure of . . . sophistication in sorting out excessive claims," Kozec, 399 Mass. at 517, the suggestion here was that they properly and logically could consider the evidence of heroic and humanitarian efforts to save the victim, and the rhetoric of how his life "mattered" to everyone except the defendant, on the question of the defendant's indifference to the victim's suffering. The judge's general instructions on evidence, sympathy, and arguments of counsel did not dispel that notion. See Santiago, 425 Mass. at 501. He did not specifically address the prosecutor's improprieties, which were hard driving and sustained, and which went to a critical aspect of the case. The prosecutor's argument far overshadowed the defendant's assertion at trial that he was concerned for the victim and did not realize that he was stabbing him.

The portion of the argument that presumed that the defendant was not credible because he was on trial challenged the heart of the defense, namely, the defendant's credibility as to who was the initial aggressor, who produced the knife, and whether the defendant had acted in self-defense. Again, the

judge's general instructions did not adequately address the error.

Although there was no objection, which is some indication of the level of prejudice, that is not dispositive. Commonwealth v. Toro, 395 Mass. 354, 360 (1985). The Commonwealth's case was strong, but it was not overwhelming. We have serious concerns about the effect of the improprieties in the prosecutor's closing argument on the jury's deliberations. We need not decide if they created a substantial likelihood of a miscarriage of justice because we have identified another error in the course of our plenary review that, in combination with the errors in the prosecutor's closing argument, require a new trial. That error is discussed in the final section of this opinion.

5. Jury instructions. The defendant asserts error in the jury instructions. We address them because they may arise on remand. First, he argues that the judge failed to instruct the jury that in order to return a verdict of guilty of murder, the jury must find that the Commonwealth proved beyond a reasonable doubt the absence of mitigating circumstances, specifically, the absence of excessive force in self-defense. Second, the defendant contends that the instruction on manslaughter was flawed because it used permissive language that failed to require the jury to find manslaughter if the defendant used

excessive force in self-defense, and because it inconsistently stated that the jury should consider manslaughter only if the defendant lawfully was acting in self-defense.  There were no objections to the judge's instructions.

The Model Jury Instructions on Homicide (1999) in effect at the time of the trial of this case, at page 27, contain the instruction that "[i]n order to obtain a conviction of murder, the Commonwealth must prove beyond a reasonable doubt the absence of . . . mitigating circumstances," including "excessive use of force in self-defense."  The judge did not include this instruction, and he should have included it.  However, the judge twice instructed the jury that to obtain a conviction of murder the Commonwealth must prove beyond a reasonable doubt that the defendant did not act in self-defense, and if it failed to do so, then they must find the defendant not guilty.  The judge also instructed that if the Commonwealth proved beyond a reasonable doubt that the defendant used excessive force in defending himself (the judge defined excessive force in self-defense), then the jury should return a verdict of guilty of voluntary manslaughter.  This was a correct statement of law. See Commonwealth v. Glacken, 451 Mass. 163, 167 (2008); Commonwealth v. Williams, 450 Mass. 879, 885 n.4 (2008); Commonwealth v. McLaughlin, 433 Mass. 558, 563 (2001); Commonwealth v. Little, 431 Mass. 782, 787 (2000); Commonwealth

v. Boucher, 403 Mass. 659, 663 (1989).  It also conformed with the Model Jury Instructions on Homicide (1999), at page 30.  There was no error, but we urge judges to adhere to the model instructions on homicide.  On remand, the 2013 version of the Model Jury Instructions on Homicide should be followed.

The defendant's final argument fails.  The judge erred by his use of the permissive words "may" and "should"[4] when discussing use of excessive force in self-defense, rather than the clearly directive "must."  See Commonwealth v. Santos, 454 Mass. 770, 776-777 (2009).  See also Commonwealth v. McLaughlin, 433 Mass. 558, 563 (2001) (where mandatory language is required, permissive language should not be used).  In Santos, a new trial was required because the judge used permissive language and "failed to make clear to the jury . . . that murder was unavailable," and not an option, where the killing occurred as a result of the use of excessive force in self-defense.  Id. at 776.  Here, the judge instructed the jury that "[i]f the defendant used excessive force in defending himself in light of all the circumstances, the defendant may be found guilty of no more than manslaughter."  Unlike the judge at the underlying trial in Santos, the judge here made it abundantly clear that murder was not an option if the Commonwealth proved that the

---

[4] See Commonwealth v. Caramanica, 49 Mass. App. Ct. 376, 378 (2000) ("should" is permissive).

defendant used excessive force in lawfully defending himself. Although the judge did not use the precise language used in the Model Homicide Instructions (2013), at page 71, he anticipated the basic instruction that has been approved for current use.

There is no merit to the defendant's claim that the judge incorrectly instructed the jury that voluntary manslaughter is the use of excessive force when lawfully defending oneself. This was a correct formulation. As we said in Santos, "the use of excessive force deprives the defendant of his right to be acquitted altogether, entitling him instead to a verdict of manslaughter." Santos, 454 Mass. at 775. There was no error.

6. Review under G. L. c. 278, § 33E. There was evidence that the victim was the first aggressor, that the victim introduced a knife during the fray, that the defendant was fearful of the victim, and that the defendant swung the knife wildly. This evidence, particularly the evidence of the defendant's mental state, warranted an instruction on reasonable provocation. The defendant was entitled to such an instruction, and it would have been compatible with excessive force in self-defense. Indeed, it probably would have been more favorable to the defendant. Such an instruction, had it been given, would have allowed the jury to find the defendant guilty of voluntary manslaughter if they had a reasonable doubt as to whether the victim initiated the fight by throwing the first punch. Counsel

should have requested such an instruction, and such an instruction should have been given.  See Commonwealth v. Acevedo, 446 Mass. 435, 446-450 (2006).  The cumulative effect of the absence of this instruction and the errors in the prosecutor's closing argument create a substantial likelihood of a miscarriage of justice.  The judgment is vacated.

The Commonwealth shall have the option of either retrying the defendant on the murder indictment or accepting a reduction of the verdict to manslaughter, which was the verdict urged by the defendant at his first trial, and which is the verdict he could best hope to obtain after a request for an instruction on reasonable provocation.  See Commonwealth v. Howard, 469 Mass. 721, 750 (2014).  The Commonwealth shall inform this court within fourteen days of the date this opinion issues whether it will retry the defendant for murder in the first degree or move to have the defendant sentenced for manslaughter.  After the Commonwealth so informs us, we will issue an appropriate rescript to the Superior Court.

So ordered.